Good morning may it please the court my name is Kimberly Tucker and I am attorney for plaintiff appellant Neal Williams. This is for me somewhat of an unusual case. Often in my district court briefings I would argue that the medical expert testimony is crucial to this case and I say that because there was a highly regrettable failure to develop the record at the administrative level. I do not dispute that point with the appellee but I would point out that even despite that failure to develop the record, which unfortunately I could not personally cure because this client came to me at the district court level, the medical expert testimony was based on the testimony and the lay witness statement that allowed the medical expert to say two very important things. The first is that Klonopin is, as he said, very well known to cause memory problems and he emphasized that fact. Can we know when he started to take that medication? I believe it was before 1998. Now on what basis would you find that? That doesn't seem to record with my reading of the record. We went back and looked at the Veterans Administration records as to the first time in which he showed that he was taking that medication and it was at a much later date. Well he did take, before that he did take Tegreton. Regrettably I cannot fix an exact date on that. I really wish I could. As I mentioned, there are many issues with the record, your honors. The Tegreton. The VA record shows that he was first prescribed this Klonopin or however you want to pronounce it in August of 2001 and that was sometime after he was last insured. Indeed. Do you have any better record than that? I don't, your honor. In counsel's argument, the failure to develop the record, maybe you could articulate what else is it that you would have expected the ALJ to do to develop this record. There is that reference where the doctor indicated it would be helpful if he had more records, but counsel representing the claimant at the time said he would provide the records but failed to do so. Indeed. Is that the focus or is there some other area where you failed the record? That is a primary issue, I agree. And the fact that the medical expert said it would be helpful to have additional records in the context of this case only indicates that given the ALJ's decision that she did not have what she needed to decide the case. The Social Security Act, as your honors know, is the claimant absolutely has the burden of proof, but there are many things about the act that cut in the favor of the claimant intentionally, like the loose to no application of hearsay rules, for instance. And another way that the court has interpreted it to cut in the plaintiff's favor is that the ALJ does have a duty to develop the record when the record is too incomplete to render a decision. And I would argue that that is, in fact, the case here. And I'm sorry. What should the ALJ have done? He didn't get the records within the 30 days or one month as had been promised. So then what should the ALJ do? The ALJ does have subpoena powers to issue the record, your honor. I'm sorry. I can't quite talk properly today. The ALJ does have subpoena powers to request records. She could have done that. It probably would not have required a subpoena, and I state that based on my 10 years' experience practicing out of this office. And going back, the reason the ALJ should have done that is because the MEs' statement — I'm sorry, the medical experts. I'm using Social Security shorthand here. The medical experts' statement that more records would be helpful indicates that there truly was not enough evidence to decide the case. And the ALJ does have that burden to develop the record whether or not the claimant is represented. This case is very difficult in that aspect. I will not deny that to the Court at all. Frankly, I saw that there was a major issue as far as the treatment of the claimant, not necessarily by the ALJ. I will leave it at that. But the Social Security Act is intended to provide a measure of justice for people deserving of benefits. Of course, the issue here is proving that he is, in fact, deserving of benefits. And the fact does remain that based on the lay witness statement, which the doctor felt very credible in this context and with the doctor's great experience, that the clonopin, the medication that he'd been taking, which wasn't just clonopin but also one before that, impaired him substantially. We also don't know the degree to which he was impaired because of that failure to develop the record. I believe Defenda argued that there was nothing ruling out, even with the clonopin, that would rule out working a simple job, you know, one, two, three-step job as is so often mentioned in these cases. But the medical expert isn't tasked with understanding the vocational side, which is knowing that a person who misses more than, generally, it's two or two plus days a month from work, would, in fact, not be able, would be classified as disabled under the Act. There was a vocational expert and the ALJ heard that testimony and considered it, correct? Yes. But again, there was a lack of information. And that is why the appellant is only requesting relief of remand for further consideration and development of the record. Is there any indication of what this additional evidence might have shown? It would have shown, Your Honor, exactly when. There's more than one piece of evidence out there, one set of medical records. I believe there are additional VA records that would show the actual date that the clonopin was prescribed. The VA records, they're set in such a way, they're written in such a way that, you know, when they re-prescribe something, it can look like the first time it's prescribed when, in fact, it's not the first time it's prescribed. And there are also records out there, I believe he failed to get the records, there was a failure to get the records from the OHSU Movement Disorders Clinic, which that's another issue that Mr. Williams has, is a movement disorder where, for him, it's a cervical disorder, very painful disorder, that the clonopin was meant to actually help relax the muscles as well. Did you make any effort to procure what the missing records were, and were they available to try to supplement the record? They are available. I did not try to supplement the record because there was that issue of good cause for me to submit them at the district court, which is, it's hard to do that. But you've actually seen the records? I have seen the records. I do not have them. They actually reside with my former law firm. I could certainly get my hands on them to read them. And I did read them when I was still with that firm, and we did procure the records. It was a handcuffed situation, unfortunately, for me. Was there a motion for reconsideration in this case? A motion for reconsideration? No, Your Honor. By that time, I had left the law firm, and the case was not in my hands at the time of the decision. Mr. Williams came to me personally after he was denied at the district court and asked me to represent him here, and I agreed. I do, in summary for now, because I do want to reserve some time for rebuttal, I recognize the extreme difficulties of this case, but we do have lay witness testimony. We do have medical expert testimony. We do not have evidence that would debunk the medical expert testimony aside from, I believe, there is a consultative evaluation, which wouldn't have had the right records either. So again, I would ask that the court would remand for not benefits at this time. We don't have enough information, just a new hearing to remedy an injustice done to this particular case. And that was done by whom? By the former counsel? The hearing, Your Honor, or the district court? Well, where was it done? The failure to get the records additionally. That happened at the administrative level by, and I did not pick this case up on a referral from that attorney. He fired his attorney as soon as, well, this particular attorney cannot practice in the U.S. District Court for the District of Oregon. He is only licensed in California, the attorney that did the administrative hearing. He has been declined licensing by Oregon. So he did not represent the claimant at the district court level? Oh, no. So that was a different counsel? That was me, and then it was, I'm sorry, I cannot remember, but one of my former colleagues at Swanson, Thomas, and Kuhn. You were with a different law firm at the time? Is that what you're? Correct. I need to correct my address with the court. I just recently opened my own office. But you were counsel at the district court? Yes, I was. And I raised the question, was there a motion for reconsideration once you had those records, asking the district court to review now the new evidence, but that motion was not made? It was not made. Again, I have practiced before that court for many years. I started my career there. And the standard to get new records in is very high, which is why I took the route I did in my briefing, Your Honors. All right. I will reserve the rest for rebuttal unless you have any other questions. What did you just say a couple seconds ago? Oh, at 48? What? I'm sorry. What was your question? What did you just say a few seconds ago, the last statement you made? What were you telling us? Oh, about the motion for reconsideration. Yes. In the U.S. District Court, there is a very high bar as far as getting records in to be reconsidered. Is it one of the criteria, that you have additional evidence that wasn't available to you at the time? Yes. And could not you have met that standard? Well, I can't say that the evidence was not available at the time. But it wasn't available to you as counsel at the time. Am I correct? That is correct. However, I don't know of a successful argument made just because counsel is different, which, to answer your question, that's why I took the route I did in my briefing. That's why you took the what? Took the particular approach I did in my briefing, Your Honor, to this Court and to the district court. Well, then, are you saying that you filed up and now you want us to give you another chance? Is that what you're saying? No, that's not what I'm saying. The problem is that the mistake lies below where I took the case, Your Honor. And in my experience, it is very, very difficult to get records admitted to the district court. I analyzed that from all possible angles. But then you could have appeal from the denial of the motion for reconsideration. That is true. Again, though, given my experience with that particular, seeing that particular argument even made, I feel like that would have been valuable time for the district court to consider. I'm just sitting with no benefits. Thank you. Okay. Good morning, Your Honors. Good morning to the clerks and also good morning to counsel. Brett Ekelberg on behalf of Commissioner of Social Security, Michael Astreux. Your Honors, the key facts in this case are the parameters that the law sets for the analysis of the evidence that's before this Court. And the Commissioner would submit that the first key fact that the Court should look at and has already brought to the forefront is the alleged date of disability onset, which in this case was March 1st, 1996. The other key parameter is the date last insured, which is March 31st, 2001. And according to 42 U.S.C. 423A1A, Mr. Williams bears the burden of proving he is disabled by his date last insured for the purposes of Title II benefits. So he needs to prove he was disabled by March 31st, 2001. And the Commissioner is just going to cut right to the chase and focus on the question of the medical expert as the Court has, you know, brought this issue. The question of what? I'm going to cut right to the chase, Your Honor, and focus on this question about the medical expert, Dr. McDevitt. Okay. Yes, who testified in February of 2009 at the administrative hearing. And Dr. McDevitt opined at this time that Mr. Williams had a mood disorder. And Dr. McDevitt said, but it was under control with medication. And that appears in the record at pages 80 through 81 and at page 95. And this is in the Commissioner's brief. What's given rise to the question before the Court is Dr. McDevitt's testimony in February of 2009 that Mr. Williams might, he said, might also have a cognitive impairment due to the side effects of taking either clonazepam or Klonopin. And the drug goes by both names, and the physicians within this record are using them interchangeably. Now, is there anything in that record that would show when he started taking it? Absolutely, Your Honor. The ALJ specifically found and stated in her decision when Mr. Williams began to take Klonopin. Well, that may be what the ALJ said, but where does that come from in the record? Absolutely, Your Honor. It's in the record at page 534 to 535, and also what's interesting is Mr. Williams himself testified at page 43 of the record that he began to use Klonopin or Klonazepam in August of 2001. And is that consistent with the reference that you just made to the record? Correct. And the ALJ, the page cite in the decision at ER-7 is to the record that I just cited. As the ALJ said, treatment records reflect the claimant was not prescribed this medication until August of 2001, after his date last insured. Which was March 31st of 2001. Well, that's consistent with what I found in the VA records. That is correct. This indication of August 2001 as the starting point appears in multiple places, but the key portion is at page 534, 535, and Mr. Williams himself testifying at the hearing that he did not begin to take it until August of 2001. The question is then that Dr. McDevitt raises is, was he impaired? Do the side effects of this particular drug are immaterial in this particular case because of the parameter from 42 U.S.C. 423 A1A? That's the date last insured. If there were any side effects, and the Commissioner's position is there were not, Mr. Williams actually described clonazepam as a miracle drug. He said it allowed him, in November of 2001, he's talking to Nurse Campbell. He said clonazepam was a miracle drug, and he, as a result of taking it, could handwrite a three-page memo. And that's what he said to Nurse Campbell. And at the same time, he's telling Nurse Campbell in November of 2001, past his date last insured, that he owned a small computer repair business, and he was actively working at that time. And that's the other portion of this record, which I would like to share with this Court briefly as an overview about the substantial evidence that was before the ALJ in terms of making this decision, because there was substantial evidence to underpin and upon which the ALJ based her decision. But these possible side effects due to clonazepam, they wouldn't have occurred until after the date last insured if they did. And the Commissioner's position is there were not adverse side effects from this drug. As to the question of the record, the ALJ specifically allowed and left the record open to give counsel time to submit records. I've heard that these records exist. To my knowledge, this is the first time the Commissioner has learned of that. But that being, setting that aside, the ALJ did fulfill his duty, her duty to develop the record. One way in which the ALJ can develop the record is by leaving the record open so that the claimant, the claimant's representative, or the claimant's attorney in this case, has the opportunity to fulfill his burden, which is to provide the ALJ with the records he or she needs to reach a decision about whether he or she, the claimant, is disabled or not. So the ALJ fulfilled this duty that is shared with Mr. Williams. And the ---- Dr. McDevitt speculated that he needed. He said, if I'm going to assess the side of a person who has autism, what would be helpful to me? And to see if he had a cognitive impairment, what would be helpful to me would be to look at Mr. Williams' school records, because that would give us an indication of his mental functioning, his ability to process information. So I would like to look at his school records. That would be a nice way for me to be able to ascertain his abilities. The other thing he asked for was if the OHSU records existed, the Oregon Health and Sciences University records from their movement clinic. And there is not a ---- it's not clear from the record whether those existed or not. If you were to look at page 102 and 103 of the excerpts of record, that's the tail end of the administrative hearing, and you have a exchange. And this is in the Commissioner's brief, but it's worth sharing again verbally with the Court. At the end of the administrative hearing, given Dr. McDevitt's testimony that this might be helpful for him to have these records, the ALJ asks the attorney, you have until March 18th in order to get these records to the Court. And this was on the hearing date of February 18th of 2009. So the ALJ gave counsel 30 days in which to secure records. As the ALJ said, any records you might have, if they exist, leave the record open. 20 CFR section 404.944 says that leaving the record open is a way for the ALJ to develop the record, 404.944. And the Tonopetian case also speaks to that proposition. So the ALJ was doing her duty, leaving this record open. And the attorney says in response to the ALJ, March 18th, oh, just to make sure, I want to make sure of what I still need to do, so I'm going to look through this if I could. That's not going to work. I'll get you the OHSU records, and then I'll give you the OHSU records, and then I'll also give you some declarations from people who knew him in the relevant time period. And the ALJ says, I can't hear you. Oh, I'm sorry, I'll give you the OHSU records for those 10 years and also give you some declarations from people who knew him during that relevant time period. And the ALJ says, that's, yeah, you can do that, but I also want the school records, because the ALJ realizes that the school records are what are going to give the best insight from her perspective onto the mental functioning. And the attorney says, oh, yes. And the ALJ says, and okay, the movement records, the school records, and any other psychological records you might have, attorney, real good, okay, I'll do it. And I share this with the Court not to, you know, overdo that particular exchange between the ALJ and the attorney at that level, but to emphasize the point that the ALJ did her duty to keep the record open, fulfilled her duty. So the ALJ could have obtained those records since it was clear as to what records we were discussing, but is it your position that it wasn't necessary for her to attempt to subpoena them or in some other way obtain them because counsel had indicated that he would provide those records? What's important, Your Honor, is to know that this is a shared duty. It's a non-adversarial process at the administrative level. It's a shared duty. And with Mr. Williams. But what might be a little concerning is apparently the counsel was delinquent or not effective, and the ALJ probably knew that. So should she have gone ahead and ordered the records herself? Well, Your Honor, the ALJ would not necessarily have known that the counsel was ineffective. And I'm not – I don't think the Commissioner's position is that the counsel was ineffective. It could be possible the records don't exist. Well, after they weren't furnished during the relevant period, then she may know something's wrong. Well, this arose in the course of the hearing. The only reason this type of discussion of the records arose was Dr. McDevitt said they might help him determine whether there was a cognitive impairment. So it was on the spot, and so the ALJ did what was appropriate, which was to ask counsel for Mr. Williams to do his duty, which is to furnish medical and other evidence that can be used to reach conclusions about his medical impairments and its effects on his life-sustaining basis. That's a shared duty. And the issue is – Well, when you say it's a shared duty, one side fails. Does it impose an obligation on the ALJ to go ahead and act on her own to get those records? No, Your Honor. It does not in the sense that – Well, what do you mean by shared? Shared is by regulation. And shared duty, it's at 20 CFR 404.1512A. That's where the discussion about the shared duty is for both parties to develop the record. And to meet his burden to prove disability, Mr. Williams must bring to the Commissioner's shows that he is blind or disabled. And that's at 20 CFR sections 404.1512A again, and 404.1540B1. So there's a shared duty. But the other portion to speak to Your Honor's question was, there was adequate evidence for the ALJ to make a determination in this case. There was adequate evidence. There's no ambiguity about the clonopin start date. That was after the date last insured. And the ALJ was able to look at the substantial evidence in the record, which was the ability during the time period in question for Mr. Williams to attend college and to get A's and B's despite the claims of a hand impairment to do sculpture classes, which His Honor Judge Mossman discussed in his decision. He worked to manage his own business. In March 1997, he told the VA he was busy with his computer business and turned down appointments when they called him up. October of 1999, he told the VA he earned $25,000 in total income. Dr. Johnson saw him in March of 2003, again told him how his business was successful. He was successfully treated with clonazepam and saw Dr. Zhang in May of 2005, and she gave him a GAF score of 70 at that time, which was mild symptoms. And he had a GAF score in 2004 of the highest that she estimated to be at 80. Dr. Storsback's diagnosis of cognitive disorder did not occur until six and a half years after the date last insured, and for that matter, again, is outside the parameter set by the VA. So my time has expired. I have 10 seconds left here. I'm over 10 seconds. I'm sorry. I saw that. But the Commissioner, again, would submit and ask this Court to affirm the ALJ's decision because it is supported by substantial evidence, and Dr. McDevitt's need for the records was met. There was not an error. There was adequate evidence to make the decision. If there was an error, it was harmless, and if it wasn't harmless, it was an invited error, and that has been briefed by the Commissioner. Thank you, Your Honors. Dr. McDevitt. Just one question of counsel. So is this your practice area, the social security cases, and you would consider yourself to be an experienced counsel practicing in this area? Yes, Your Honor. So do you have any experience with an instance similar to this when the ALJ might have followed up by either issuing an order to show cause as to why counsel shouldn't be sanctioned for failing to provide these records or doing something to assure herself that the records either didn't exist or weren't going to be helpful? I actually do have particular experience in front of this ALJ. She was in that office from 2004 to late 2000. I think this was one of her later decisions before she left the office. So, yes, I do have extensive experience. Also in that office, I have seen not enough letters to counsel to say provide these records or else. I wanted to address quickly a point that counsel for defendant made, and that is that you had asked the question, Your Honor, about whether the ALJ had any way to know that this particular counsel representing Mr. Williams before the administrative law judge had any way to know that this particular judge was ineffective. And my answer to that, based on my experience in that office, I have been practicing out of that office almost solely since 2003 and have done actually hundreds of hearings in that time. Yes, they knew. And that, again, is based on my experience. Practicing in that office as frequently as I did and hearing what I would hear from other judges, if she didn't know, she should have known, but she knew. She absolutely knew. The defendant's argument, or appellee's argument, I should say, about the ALJ having met her obligation to develop the record, there is a difference between allowing additional development of the record and meeting the burden of developing the record. Here, by counsel's admission, records were known to exist, and the ALJ, again, knew not only of this counsel, but of her rights to subpoena or obtain records on her own, but did nothing. The last point I would like to make is that before 2001, if, in fact, that was the very, from all we know from the record, that is, the first date that the clonazepam or clonapine was prescribed, he would have had the dystonia, the hemidystonia. And there are other indications, we don't really know because we don't have records, that there was some work done, we know he went to school. We don't know the context in which he was able to do those, and that's key. If he was able to go to school because he was getting accommodations, if he was able to go to school like so many of us, for instance, an undergraduate, you can pick what time you take your classes. You can take breaks between classes. Note-taking can actually be done for you. So going to school certainly doesn't rule out disability under the Social Security Act, which requires a showing that you can work full-time without missing, well, regular and continuing basis is what Social Security ruling 96-8P says. The ALJ could have looked into that issue further. She could have questioned further. She did not. So there is a failure to develop the record there as well. And I said that the last was my last point. I apologize. This is my last point. In the testimony of Mr. Williams, and I should have written down this page number, and I didn't. I apologize. One of the standard questions asked by this judge, do you drive? His response, no. I take medications. We don't know how long that that was the case, that he wasn't driving because of medications. And we also don't know, because there was no development, how much his dystonia would have interfered with his driving. If there are no further questions, I would submit this. Thank you. Thank you, Your Honors.
judges: Marshall, Fletcher, Pregerson